United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| DOMINGO R. DAVIS,<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>CITY OF SANTA CLARA, et al.,<br><br>　　　　　　Defendants. | Case No.　5:15-cv-05603-EJD<br><br>**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 43 |

## I.  INTRODUCTION

Domingo R. Davis ("Davis") was arrested while attending a 49ers football game at the Levi's Stadium ("Stadium").  Davis later pled *nolo contendere* and was convicted of resisting, delaying and obstructing a police officer in violation of California Penal Code §148.  Plaintiff filed this civil rights suit against the City of Santa Clara and the arresting officer, Cuong Phan, asserting claims for violation of 42 U.S.C. §1983, false arrest/imprisonment, and violation of California Civil Code §52.1.  Presently before the Court is Defendants' motion for summary judgment, or in the alternative partial summary judgment.  The motion was heard on March 15, 2018.  Based upon all pleadings filed to date, the comments of counsel, and the evidentiary record[1], the Court grants Defendants' motion for summary judgment.

---

[1] Defendants' objection to Plaintiff's Objection To Evidence Offered In Support Of Defendants' Motion For Summary Judgment/Partial Summary Judgment (Dkt. 48-5) is well taken.  Plaintiff's Objection violates the Court's Standing Order for Civil Cases and Local Rule 7-3(a), both of which require objections to be set forth in a party's brief.  Plaintiff's four-page Objection is stricken and will not be considered by the Court.

A. October 5, 2014 Incident

On October 5, 2014 at approximately 3:24 p.m., Officer Phan was in full uniform and providing security at the Stadium when he was flagged down by private security personnel employed by Elite Security. The security personnel waved at Officer Phan with one hand and pointed with his other hand towards a male subject in the crowd who had "clenched fists" above his shoulders and was "bouncing around." Phan Depo., 14:4-17:4.

Elite Security Personnel Rahsaan Lewis' Account of the Incident

The Elite Security personnel who brought Davis to Officer Phan's attention was Rahsaan Lewis ("Lewis"), a security supervisor at one of the Stadium stores. Lewis was walking to lunch with a coworker when a guest services employee told him there were two men "almost looking like they were going to fight, but not quite fighting yet." Lewis Depo., 13:10-15. Lewis stopped and observed two men "standing toe to toe." Id. at 33:21-34:7. One of the men had his "arms up. . . in a way saying, hey, look, I'm not trying to fight this guy." Id. at 13:16-22. Lewis heard some profanity from both men, but no threats. Id. at 15:13-21. Lewis decided to contact a police officer because "the gentleman put his hands up and he backed away, but [Davis] wasn't walking away." Id. at 16:11-13. Lewis called an officer over "just to be able to diffuse the situation if there's going to be one." Id. at 16:18-20.

Lewis conveyed to Officer Phan what he had been told by the guest services employee and said "you might want to check this out because the other – they looked like they were really close. It might be something." Id. at 17:8-13. According to Lewis, when Davis saw Officer Phan, "he did like kids do in the hallway when they see the principal. They kind of start walking. He didn't take off running, but he just started walking like, hey, I'm getting out of here." Id. at 17:19-23.

Lewis heard Officer Phan ask Davis to stop to talk. Id. at 18:8-9. Davis stopped with his back to Officer Phan. Id. at 18:11. Lewis heard Officer Phan say "something to the effect 'I don't know what's going on. I'm just trying to talk to you. I don't want to have to take anybody

United States District Court
Northern District of California

anywhere.'" <u>Id</u>. at 18:12-15. As Davis was walking away, Officer Phan got closer and went to grab Davis' hand "just to kind of stop him and say, 'Hey, let me talk to you for a moment.'" <u>Id</u>. at 18:25-19:2. That's when Davis turned around and "squared up on the officer. . . . "put[ting] his fist up like he was ready to fight or like he was going to swing on him." <u>Id</u>. at 19:3-19:9. There were fans all over the concourse. <u>Id</u>. at 22:4-5. Lewis described the scene as follows:

> Davis looked like a linebacker coming around the line on an offensive line, and he did what you call a swim move. And that's when he did the swim move and he turned around and he put his fists up to the officer like he was ready to fight. And I remember saying to a coworker does he really think this cop is going to fight him. . . . There were quite a few people standing around watching.

<u>Id</u>. at 22:9-15.

Officer Phan responded by shooting his taser at Davis. <u>Id</u>. at 19:11. Davis fell to the ground, shaking and convulsing a little bit. <u>Id</u>. at 19:19-20. According to Lewis, "once the officer felt like he was prone and couldn't do anything else, he released the taser, took it off of him." <u>Id</u>. at 19:20-19:22. Once Davis got his bearings, "he began trying to kick. It was almost like he was back and the officers were standing over him, but he wasn't going to allow" the officers to arrest him. <u>Id</u>. at 20:2-7. Lewis described Davis as "being combative." <u>Id</u>. at 20:25. Officer Phan used the taser again and Davis was taken into custody. <u>Id</u>. at 21:1-11.

<u>Officer Phan's Account of the Incident</u>

After being contacted by Lewis, Officer Phan observed Davis attempting to engage in a fight with several males in the crowd. Phan Depo., 17:24-18:17. Officer Phan walked up to Davis. <u>Id</u>. at 19:9-19:10. Officer Phan eventually got within about an arm's-length of Davis with Davis facing away from him. <u>Id</u>. at 20:3-20:6. Officer Phan told Davis to calm down and to put his hands down. <u>Id</u>. at 20:10. Officer Phan remembers speaking to Davis face-to-face and telling him to calm down. <u>Id</u>. at 22:2-22:3. Officer Phan then told Davis to turn around and put his hands behind his back. <u>Id</u>. at 22:3-22:4, 23:22-23:24. Davis placed his hands behind his back, with his hands back-to-back and fingers interlocked. <u>Id</u>. at 23:25-25:8. Officer Phan grabbed three or four of Davis' fingers as he was attempting to place Davis in handcuffs. <u>Id</u>. at 24:17-25:8.

Davis suddenly spun around and faced Officer Phan in a bladed stance, "as a boxer" with his clenched right first back. Id. at 25:14-26:17. Officer Phan believed Davis was going to "attack" him. Id. at 29:23-29:25. There was a crowd in the area. Id. at 29:8. After quickly considering alternatives, Officer Phan drew his taser. Id. at 29:3-31:3. Officer Phan discharged the taser towards Davis' abdomen and Davis fell to the ground. Id. at 31:20-33:2. Officer Phan does not remember if Davis was in pain, but remembers Davis cussing very loudly while on the ground. Id. at 33. Officer Phan told Davis to roll onto his stomach and to "stop resisting." Id. at 33:25-34:9. Officer Phan used his radio to request emergency assistance because (1) he was by himself, (2) he had deployed the taser, (2) Davis was not in custody, and (3) a large crowd was gathering. Id. at 34:22-34:24.

According to Officer Phan, Davis pulled out one of the taser prongs, continued to resist arrest and used a wrestling move called "shrimping" to try to move away. Id. at 41:6-42:3, 78: 23-78:24, 81:20. Officer Phan activated another cycle of the taser, but determined it was ineffective because Davis was still physically resisting and moving. Id. at 40:17, 42:6-42:25. After the second activation of the taser, Officer Phan told Davis to roll onto his stomach, but Davis continued "shrimping." Id. at 47:1-47:11.

Officer Pham holstered his taser and took out his baton because he believed the taser was ineffective. [2] Id. at 47:11-47:17. Before Officer Pham used his baton, however, one or two officers arrived. Id. at 47:23. The officers tried to grab Davis' hands, but Davis "never complied" and at some point started kicking upwards towards the officers. Id. at 52:12-52:19.

Officer Phan replaced the cartridge in his taser and warned Davis that he was going to use the taser again. The third activation of the taser, which was directed to Davis' back, was effective. Id. at 53:1-54. 77:11-77:22. Davis' body stiffened up and the officers were able to control his hands and put him in handcuffs. Id. at 77:20-77:22.

---

[2] The data downloaded from Officer Phan's taser indicates the length of time the taser was activated, but not the effectiveness of the device. There is no data available to establish whether each of Officer Phan's taser activations was effective.

Lisa Capocci's Account of the Incident

Lisa Capocci ("Capocci") also witnessed a portion of the incident. Capocci was working for a private contractor as an explosive detection dog handler at the Stadium. Capocci is a United States Air Force veteran, a former Deputy Sheriff with the Alameda County Sheriff's Department, a former police officer with the Concord Police Department, and is currently a drill sergeant in the Army Reserves. On the day of the incident, Capocci heard someone challenging others to fight. Capocci Depo., 21:2-21:5. That person, later identified as Davis, was very agitated and yelling. Id. at 22:10. Based on her training and experience, Capocci believed Davis was exhibiting signs of being intoxicated. Id. at 22:11. Capocci walked to the area and saw an officer (Officer Phan) talking to a man (Davis). She described the scene as follows:

> I saw the officer, small guy, trying to talk to this guy. . . . Trying to calm him down, trying to give him some orders. I know that he tried to direct him into handcuffs or put him on the ground, and that did not work. The officer was very small; the suspect was large, in my opinion. So knowing what I know in my law enforcement experience, I'm seeing this officer by himself and that's not good, so that piqued my interest even more.

Id. at 21:13-21:23. The situation escalated as a crowd began to gather. Id. at 24:4-24:6. Capocci recalls Officer Phan attempting to place Davis in a hold, but Davis got out of the hold. Id. at 24:21-25:1. In Capocci's opinion, Davis was a "textbook noncompliant suspect" and was "slipping off" Officer Phan. Id. at 26:11-26:17. Capocci recalls Officer Phan giving several commands to comply and to submit to the arrest. Id. at 26:21-26:22. Officer Phan used his taser and Davis fell to the ground. Id. at 27:3. Davis remained "very noncompliant" on the ground. Id. at 27:11. When additional officers arrived, Capocci left the scene. Id.

Scott McLaggan's Account of the Incident

Another witness, Scott McLaggan ("McLaggan") saw Officer Phan speaking to Davis. McLaggan Decl., ¶2. According to McLaggan, Davis was belligerent and yelling. Id. at ¶2. McLaggan saw Davis "go into a Mixed Martial Arts attack/defensive fighting stance with his hands up, open and below his shoulders." Id. at ¶4. McLaggan saw Officer Phan use the taser only one time when Davis first fell to the ground. Id. at ¶6.

Case No.: 5:15-cv-05603-EJD
ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Davis' Account of the Incident

Davis' account of the incident differs from those of the other witnesses. According to Davis, the incident occurred as follows:

> Upon initial contact with Sergeant Phan on October 5, 2014, without warning or notice Phan grabbed my arm and spun me around while he moved so that we could face one another and I put my hands up in front of me thinking someone was going to hit me and almost immediately upon seeing Phan I felt an electric shock that caused me to lose control of my body and fall to the ground.

Davis Decl., ¶2; see also Davis Depo., p. 74-78. Davis contends that "at no time before Phan grabbed me did I hear Phan speaking and I had no cognitive awareness that Phan was a law enforcement officer until sometime during by my being tased by him after I fell to the ground." Davis Decl., ¶2:23-25. Davis estimates that the electricity continued for twenty-four seconds. Davis Depo. at 81:19-80:4. Davis pulled out one of the taser prongs, which stopped the electrical flow. Id. at 82:14-83:6, 88:17-89:1. Davis remembers being handcuffed, strapped to a gurney, and placed in an ambulance, but nothing else. Id. at 90:4-91:7.

After the October 4, 2014 Incident Had Ended

Individuals arrested at the Stadium are taken to a temporary holding facility for processing. Gilbert Decl., ¶3. A guest services representative obtains the seat information from the arrested individual and identifies the season ticket holder. Id. The ticket holder is then notified that they are responsible for whom they sell their tickets to and, if inappropriate behavior occurs/continues, the ticket holder could lose the season tickets. Id. It was also standard procedure at the time of Davis' arrest for Santa Clara Police personnel to advise individuals who have been arrested and/or ejected from the Stadium for disruptive behavior that if they return to the Stadium, they will be subject to arrest for trespassing pursuant to California Penal Code §602. Id.

Davis was transported by ambulance from the Stadium to Valley Medical Center. Davis told the ambulance crew that he had not had anything alcoholic to drink. Davis Depo. at 113:8-10. Davis also denied drinking alcohol to hospital personnel. Dippell Decl., Ex. 6. Davis was admitted to Valley Medical Center with his "Hospital Problems" described as uncontrolled type II

diabetes, ketoacidosis, alcohol intoxication, and an abnormal EKG.  Id.  Hospital staff obtained a blood sample from Davis at 5:30 p.m., approximately two hours after the incident with Officer Phan, which revealed an alcohol content of 239 mg/dl.  Id.  Later, during his deposition, Davis admitted he had tailgated before the October 4th incident and had consumed about six beers, a couple of shots of Crown Royal, and smoked a couple of marijuana cigars.

According to calculations performed by Defendants' forensic scientist, Kenton Wong, Davis' blood alcohol concentration ("BAC") at the time he was arrested was approximately .24%.  Wong Decl., ¶7.  In Wong's opinion:

> The combined impairing effects of Mr. Davis' high BAC in concert with THC's (marijuana) ability to induce hallucinations and/or distort time/space/reality would unequivocally impair Mr. Davis' mental (as well as physical) state such that it would make it highly unlikely that he could possibl[y] recall his arrest with any clarity or accuracy.

Wong Decl., ¶9.[3]

B. November 2, 2014 Incident

On November 2, 2014, Davis was attending another game at the Stadium.  Officer Pham saw Davis and told him he was not allowed to return to the Stadium until Davis had successfully completed an anger management class.  Phan Decl. at ¶1.  According to Officer Phan, Davis became agitated and responded with profanities.  Id. at ¶2.  Davis, however, contends otherwise, describing himself as "calm, inquisitive and matter-of-fact."  Davis Decl. at ¶5.  Davis did not know that he was not allowed at the Stadium.  Id.  Officer Phan told Davis he was not supposed to be at the stadium and ordered Davis to leave.  Phan Decl. at ¶3.  Davis complied.  Id.; see also Davis Depo. at 107:11-108:15.

C.  Plaintiff's Conviction in Connection with October 5, 2014 Incident

Davis was charged with resisting, delaying and obstructing a police officer based on the

---

[3] Davis' objection to the Wong Declaration based upon Federal Rule of Evidence 403 is overruled.  Davis' additional Rule 403 objections to other evidence of alcohol consumption and marijuana use, including Davis' own testimony and medical records from Valley Medical Center (Dippell Decl. Ex. 4 and 5) are also overruled.

October 5, 2014 incident. Davis pled *nolo contendere* and was convicted of violating California Penal Code section 148(a)(1).[4]

### III.  STANDARDS

A motion for summary judgment or partial summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Addisu v. Fred Meyer, Inc., 198 F.3d 1130, 1134 (9th Cir. 2000).

The moving party bears the initial burden of informing the court of the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, admissions, or affidavits that demonstrate the absence of a triable issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the issue is one on which the nonmoving party must bear the burden of proof at trial, the moving party need only point out an absence of evidence supporting the claim; it does not need to disprove its opponent's claim. Id. at 325.

If the moving party meets the initial burden, the burden then shifts to the non-moving party to go beyond the pleadings and designate specific materials in the record to show that there is a genuinely disputed fact. Fed. R. Civ. P. 56(c); Celotex Corp., 477 U.S. at 324. A "genuine issue" for trial exists if the non-moving party presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in his or her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).

The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, the mere suggestion that facts are in controversy, as well as conclusory or speculative testimony in affidavits and moving papers, is not sufficient to defeat summary judgment. Id. ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts."); Thornhill Publ'g Co. v. GTE Corp., 594 F.2d 730, 738 (9th Cir. 1979). Instead, the non-moving party must come

---

[4] Defendants' Request to Take Judicial Notice of the public records pertaining to the October 5, 2014 incident is granted.

forward with admissible evidence to satisfy the burden.  Fed. R. Civ. P. 56(c).

"If the nonmoving party fails to produce enough evidence to create a genuine issue of material fact, the moving party wins the motion for summary judgment."  <u>Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1103 (9th Cir. 2000).  "But if the nonmoving party produces enough evidence to create a genuine issue of material fact, the nonmoving party defeats the motion."  <u>Id</u>.

## IV.  DISCUSSION

### A.    Application of <u>Heck v. Humphrey</u> Bar to Section 1983 Claim –October Incident

Defendants contend that Davis' Section 1983 claim for unlawful arrest and excessive force is barred based on the Supreme Court's decision in <u>Heck v. Humphrey</u>, 512 US. 477 (1994), because the claim implies the invalidity of Davis' conviction for violation of Penal Code section 148(a).  Citing <u>Yount v. City of Sacramento</u>, 43 Cal.4th 885 (2008), Davis argues that the <u>Heck</u> bar does not apply because his claims are directed to the unreasonable force used to effectuate his arrest.  Specifically, Davis contends that Officer Phan's multiple activations of his taser for in excess of 41 seconds over the approximately 4-minute interaction constitutes excessive force.[5]

In <u>Heck v. Humphrey</u>, the Supreme Court held that:

> [I]n order to recover damages for . . . harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a §1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus.. . . A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is *not* cognizable under §1983.  Thus, when a state prisoner seeks damages in a §1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed.

---

[5] Davis relies upon the declaration of his retained expert, Roger Clark ("Clark"), which sets forth several opinions regarding the unreasonableness of Officer Phan's actions during the October incident.  Defendants' request to strike the Clark declaration is granted.  "[T]he Ninth Circuit precludes reliance on expert reports on the question of reasonableness to avoid summary judgment."  <u>Mellen v. City of Los Angeles</u>, No. 15-3006 GW, 2016 WL 763827, at *32, n. 47 (C.D. Cal. Dec. 22, 2016); <u>see</u> also <u>Lal v. California</u>, No. 06-5158 PJH, 2012 WL 78674, at *8 (N.D. Cal. Jan. 10, 2012), aff'd, 746 F.3d 1112 (9th Cir. 2014).

Heck, 512 U.S. at 486-87. "[T]he relevant question is whether success in a subsequent §1983 suit would 'necessarily imply' or 'demonstrate' the invalidity of the earlier conviction or sentence under §148(a)(1)." Id. at 487.

In Yount, supra, the plaintiff was shot as officers were trying to transport him to jail following his arrest for driving under the influence. Just before the shooting, the plaintiff was struggling and threatening the officers, despite being in handcuffs and leg restraints. The officer intended to draw and fire his taser to subdue the plaintiff, but mistakenly pulled out and discharged his pistol instead. The plaintiff pleaded no contest to a violation of Penal Code section 148(a)(1), which is comprised of three elements: "the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." Yount, at 43 Cal.4th at 894-95 (quoting In re Muhammed C., 95 Cal.App.4th 1325, 1329 (2002)). The plaintiff waived a preliminary hearing and stipulated to a factual basis for the plea without any explicit recitation of what those facts were. Id. at 895. The plaintiff's section 1983 claim was premised on allegations that the officer lacked probable cause to arrest him and used excessive force. In analyzing the applicability of the Heck bar, the California Supreme Court reviewed the evidence presented during a Heck hearing before the trial court and found that the plaintiff was kicking, spitting, and refusing to cooperate with the officers just prior to the shooting. Id. at 898. Based upon this evidentiary record, the Court held that "to the extent [the plaintiff's] section 1983 claim alleges that he offered no resistance, that he posed no reasonable threat of obstruction to the officers, and that the officers had no justification to employ any force against him at the time he was shot, the claim is inconsistent with his conviction for resisting the officers and is barred under Heck." Id. The evidentiary record of the Heck hearing also included evidence that the plaintiff was attempting to drive while intoxicated. The Court therefore held that the plaintiff's claim was also barred to the extent it alleged that the officer lacked probable cause for the arrest. Id. The Court, however, held that "to the extent [the plaintiff's] section 1983 claim alleges simply that [the

officer's] use of deadly force was an unjustified and excessive response to [the plaintiff's] resistance, the claim is not barred." Id. The Court reasoned, "[a] claim alleging that [the officer's] use of deadly force was not a reasonable response to [the plaintiff's] criminal acts of resistance does not 'implicitly question the validity of [his] conviction' for resisting the officer." Id. at 899.

Significantly, section 148(a) can only be violated when the officer at the time of the offense is engaged in the lawful performance of his duties. Yount, 43 Cal.4th at 894; Hooper v. County of San Diego, 629 F.3d 1127, 1130 (9th Cir. 2011) ("The lawfulness of the officer's conduct is an essential element of the offense under §148(a)(1)."); Smith v. City of Hemet, 394 F.3d 689, 696 (9th Cir. 2005) (en banc) (if plaintiff pled guilty to section 148(a)(1) based upon behavior during the course of arrest, his suit would be barred by Heck because successful §1983 claim would necessarily mean that the officers had used excessive force to subdue him and were therefore acting unlawfully at the time his arrest was effected); Beckway v. DeShong, 717 F.Supp.2d 908, 914 (N.D. Cal. 2010) (quoting People v. Wilkins, 14 Cal.App.4th 761, 776 (1993)). Nevertheless, "[i]t is sufficient for a valid conviction under §148(a)(1) that at some time during a 'continuous transaction' an individual resisted, delayed, or obstructed an officer when the officer was acting lawfully. It does not matter that the officer might also, at some other time during that same 'continuous transaction,' have acted unlawfully." Hooper, 629 F.3d at 1132.

In Hooper, supra, the plaintiff was detained and handcuffed by a privately employed loss prevention officer at a store. A sheriff arrived in response to a radio call with his department issue canine in his patrol car. The sheriff removed the plaintiff's handcuffs because she was calm and compliant, took witness statements, completed a Notice to Appear in criminal court for the plaintiff, and informed her that he was going to search her car. The sheriff found what he believed was methamphetamine and then approached the plaintiff, grabbed her wrist and told her she was under arrest. The plaintiff jerked her hand away from the sheriff. The two struggled and the plaintiff ended up on the ground lying on her stomach. The sheriff was on the plaintiff's back covering her and called for backup using his radio. What happened next was disputed. In ruling on defendants' motion for summary judgment, the Hooper court viewed the evidence in a light

most favorable to the plaintiff and determined that the plaintiff struggled briefly with the sheriff while on the ground, but eventually stopped resisting when the sheriff instructed her to do so. The sheriff called to his German Shepherd and the dog ran toward the plaintiff. The dog bit the plaintiff's head, lost its hold, and then bit and held the plaintiff's head, causing major injuries to the plaintiff. The plaintiff pled guilty to violation of section 148(a)(1). She did not dispute the lawfulness of her arrest, nor did she dispute that she resisted arrest. The plaintiff subsequently brought suit under 42 U.S.C. §1983 and analogous provisions of California law asserting that the sheriff used excessive force in response to her resistance.

The Ninth Circuit in <u>Hooper</u> held that the plaintiff's §1983 excessive force claim was not <u>Heck</u>-barred. The <u>Hooper</u> court determined that the plaintiff's arrest was "one continuous transaction," and reasoned that a holding in the civil rights suit that use of the dog was excessive force would not negate the lawfulness of the initial arrest attempt or negate the unlawfulness of the plaintiff's attempt to resist it when she jerked her hand away from the sheriff. <u>Hooper</u>, 629 F.3d at 1132-33.

Like the plaintiff in <u>Yount</u> and <u>Hooper</u>, Davis pled *nolo contendere* to violation of California Penal Code section 148(a). The validity of Davis' section 148(a)(1) conviction necessarily means that at some time during his "continuous transaction" with Officer Phan, Davis resisted, delayed, or obstructed while Officer Phan was acting lawfully. <u>Hooper</u>, 629 F.3d at 1132. Davis contends that his section 148(a)(1) conviction is based solely upon that moment in time when he was on the ground, removed the taser prong and was "kicking and carvorting." Davis' Opposition at 10:21-25.[6] Having pin-pointed the moment of resistance to the taser prong removal and the "kicking and carvorting," Davis argues that a successful verdict on his Section 1983 claim based upon events preceding the moment of resistance would not necessarily invalidate his section 148(a)(1) plea.

---

[6] Davis' contention regarding the scope of his section 148 plea is not supported by any evidence. Nevertheless, for purposes of deciding the instant motion, the Court accepts Davis' characterization of his plea.

Davis' analysis, however, overlooks an essential element of a section 148(a)(1) violation: that at time of the offense, the officer was engaged in the lawful performance of his duties. Yount, 43 Cal.4th at 894; Hooper, 629 F.3d at 1130; Smith, 394 F.3d at 696; Beckway, 717 F.Supp.2d at 914. Davis' concession that his section 148(a)(1) conviction was based upon the moment in time when he removed the taser prong and was "kicking and cavorting" necessarily encompasses a finding that Officer Phan was engaged in the lawful performance of his duties at that moment. In order for Officer Phan's actions at the moment of resistance to be lawful, Officer Phan's initial attempts to arrest Davis, including the first activation of the taser, that led to Davis' fall to the ground must been deemed lawful by virtue of Davis' conviction. Therefore, to the extent Davis is claiming in his §1983 claim that there was no justification for his arrest or the arrest was otherwise unlawful[7], as he appears to imply in his declaration, his claim is incompatible with his underlying conviction for violation of section 148(a). See Yount, 43 Cal.4th at 899. Further, to the extent Davis' §1983 claim is based upon an allegation that he offered no resistance, delay or obstruction before he removed a taser prong, as Davis appears to imply in his declaration,[8] his §1983 claim is also incompatible with his conviction for violation of section 148(a). Id. at 898.

In contrast, Heck does not necessarily bar Davis' §1983 claim to the extent it is based upon an allegation that the force Officer Phan applied in response to Davis' removal of the taser prong

---

[7] Davis suggests that the arrest was unlawful because Officer Phan did not inform him of the reason for his arrest pursuant to California Penal Code section 841. Davis' Opposition at p. 12.

[8] Defendants request that the Court disregard Davis' assertion that he did not offer any resistance, delay or obstruction before the Officer Phan first used his taser. Defendants argue that Davis' testimony is not credible because it is inconsistent with every single other witness' account of the October incident. Defendants also rely upon Dr. Wong's expert opinion that Davis' .24% BAC and marijuana use "would make it highly unlikely that he could possibl[y] recall his arrest with any clarity or accuracy." Wong Decl., ¶9.

Defendants' argument has merit. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Gregory v. County of Maui, 523 F.3d 1103, 1108 (9th Cir. 2008) (quoting Scott v. Harris, 550 U.S. 372, 381 (2007)); see also Del Rio v. Anti, No. 09-214 TJH, 2014 WL 819391, at *3, n. 3 (C.D. Cal. March 3, 2014) ("a district court may properly refuse to find a genuine issue of fact when the only evidence presented by the nonmoving party is his own uncorroborated and self-serving testimony"). Nevertheless, given the applicability of the Heck bar, it is unnecessary and imprudent to engage in what might be perceived as improper credibility determinations and the weighing of evidence.

and "kicking and cavorting" was unjustified and excessive.  See id.  "[A] claim for use of excessive force during an arrest may not necessarily imply the invalidity of the arrest or conviction and many not be barred by Heck."  Box v. Miovas, No. 12-4347 VC, 2015 WL 1927317, at *5 (N.D. Cal. April 28, 2015); see also Hooper, 629 F.3d at 1133 (a holding in plaintiff's §1983 case that the use of the dog was excessive force would not "negate the lawfulness of the initial arrest attempt," or negate the unlawfulness of the plaintiff's unlawful resistance when she jerked her hand away from the sheriff).  Accordingly Davis may proceed with his Section 1983 claim only to the extent it is based upon Officer Phan's application of force in reaction to Davis' resistance while on the ground.

## B.    Section 1983 Claim:  Excessive Force – October Incident

"Section 1983 imposes liability upon any person who, acting under color of state law, deprives another of a federally protected right."  Karim-Panahi v. Los Angeles Police Dep't, 839 F.2d 621, 624 (9th Cir. 1988).  A Section 1983 plaintiff must prove two elements: (1) the defendants acted under color of state law, and (2) the defendants deprived plaintiff of a right secured by the Constitution or federal statutes.  Id.  Davis' claim arises under the Fourth Amendment and its prohibition on unreasonable seizures.  See Graham v. Connor, 490 U.S. 386, 394 (1989) ("In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force.") ("Graham"); see also Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment.") ("Garner").

### i.    Reasonableness of Force

"The fourth amendment, applicable to the states through the fourteenth amendment, protects individuals against . . . the use of excessive force."  Id.  To determine whether the force used by officers was excessive, the court must "assess whether it was objectively reasonable 'in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation.'"  Gregory v. Cty. of Maui, 523 F.3d 1103, 1106 (9th Cir. 2008) (quoting

1  Graham, 490 U.S. at 397). This inquiry "requires a careful balancing of the nature and quality of

2  the intrusion on the individual's Fourth Amendment interests against the countervailing

3  governmental interests at stake." Graham, 490 U.S. at 396. "[C]areful attention" must be paid to

4  the "facts and circumstances of each particular case," including the following factors: "the severity

5  of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or

6  others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by

7  flight." Id. The most important of these factors is the second one. Mattos v. Agarano, 661 F.3d

8  433, 441 (9th Cir. 2011) (en banc). The reasonableness of force "must be judged from the

9  perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and

10  its assessment "must embody allowance for the fact that police officers are often forced to make

11  split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about

12  the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97.

13      In this circuit, excessive force claims are analyzed in three steps as articulated in Glenn v.

14  Washington County, 673 F.3d 864, 871 (9th Cir. 2011) ("Glenn"). First, the court must assess

15  "the severity of the intrusion on the individual's Fourth Amendment rights by evaluating 'the type

16  and amount of force inflicted.'" Id. (quoting Espinosa v. City & Cty. of San Francisco, 598 F.3d

17  528, 537 (9th Cir. 2010)). Second, the court must evaluate the government's interest in the use of

18  force. Id. Third, the court must "'balance the gravity of the intrusion on the individual against the

19  government's need for that intrusion.'" Id. (quoting Miller v. Clark Cty., 340 F.3d 959, 964 (9th

20  Cir. 2003)).

21      As to the first step, it is undisputed that Officer Phan effectively activated his taser at least

22  once in response to Davis' resistance on the ground. The discharge of a taser in dart mode is "an

23  intermediate level of force with 'physiological effects, [] high levels of pain, and foreseeable risk

24  of physical injury.'" Gravelet-Blondin v. Shelton, 728 F.3d 1086, (9th Cir. 2013) (quoting Bryan

25  v. MacPherson, 630 F.3d 805, 835 (9th Cir. 2010)). This immediate and significant level of force

26  must be justified by the governmental interest involved. Bryan, 630 F.3d at 826.

27      As to the second step, the government's interest in the use of force is determined by

28  Case No.: 5:15-cv-05603-EJD

evaluating the factors set forth in <u>Graham</u>, <u>supra</u>. Here, the severity of the crime –namely willfully resisting, delaying or obstructing a peace officer- has been characterized as a non-serious or non-severe crime for purposes of evaluating a potential Fourth Amendment violation. <u>Bordegaray v. County of Santa Barbara</u>, No. 14-8610 CAS, 2016 WL 7223254, at *6 (C.D. Cal. Dec. 12, 2016) (collecting cases); <u>Westerfield v. Wade</u>, No. 05-6645 ABC, 2008 WL 1931240, at *2 (C.D. Cal. April 9, 2008). Therefore, the severity of the crime factor weighs in favor of Davis. As for the remaining <u>Graham</u> factors, it is undisputed that Davis actively resisted arrest by removing a taser prong and "kicking and cavorting." Davis' resistance, however, did not pose an immediate threat to Officer Phan because Davis was on the ground and unarmed. It was objectively reasonable for Officer Phan to believe he was in an emergency situation because he was acting alone, Davis was resisting arrest even after being tasered, and a large crowd was gathering in the area. Nevertheless, "[a] desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury." <u>Bryan</u>, 630 F.3d at 826.

For the third step, considering the intermediate level of force applied and the non-serious or non-severe nature of the crime and lack of immediate threat Davis posed to Officer Phan or others, there is sufficient evidence in the record upon which a reasonable jury could find that Officer Phan's use of the taser in response to Davis' resistance constituted excessive force under the circumstances. To the extent Defendants seeks summary judgment based upon the objective reasonableness of Officer Phan's use of force during the October incident, Defendants' motion is denied. This does not end the analysis, however, because Defendants also contend that qualified immunity precludes any liability for excessive force.

### ii.    Qualified Immunity

"The defense of qualified immunity protects 'government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Romero v. Kitsap Cty.</u>, 931 F.2d 624, 627 (9th Cir. 1991) (quoting <u>Harlow v.</u>

Fitzgerald, 457 U.S. 800, 818 (1982)). It "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." Hunter v. Bryant, 502 U.S. 224, 229 (1991). The doctrine also "balance[s] two important, competing interests: the need to hold public officials accountable for irresponsible actions, and the need to shield them from liability when they make reasonable mistakes." Morales v. Fry, --- F.3d ----, 2017 WL 4582732, at *4 (9th Cir. 2017). "Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not 'clearly established' or the officer could have reasonably believed that his particular conduct was lawful." Romero, 931 F.2d at 627.

Two questions are relevant to an examination of whether qualified immunity shields an officer's conduct. "First, viewing the facts in the light most favorable to the plaintiffs, did [the officers] use excessive force in violation of the Fourth Amendment?" A.K.H., 837 F.3d at 1010. "Second, if [the officers] used excessive force, did [they] violate a clearly established right?" Id. Answering either question in the negative results in immunity to the officer. See White v. Pauly, 137 S.Ct. 548, 551 (2017) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory *or* constitutional rights of which a reasonable person would have known." (internal quotation marks omitted; emphasis added)) ("White"); see also Hughes v. Kisela, 862 F.3d 775, 783 (9th Cir. 2016) ("[A]t summary judgment, an officer may be denied qualified immunity in a Section 1983 action 'only if (1) the facts alleged, taken in the light most favorable to the party asserting injury, show that the officer's conduct violated a constitutional right, *and* (2) the right at issue was clearly established at the time of the incident such that a reasonable officer would have understood [his] conduct to be unlawful in that situation.'" (emphasis added)).

With respect to the first question, the record contains sufficient evidence to raise a triable issue as to whether Officer Phan applied excessive force when he used his taser against Davis when Davis was on the ground. Therefore, for purposes of analyzing qualified immunity, the Court assumes without deciding that Officer Phan used excessive force in violation of the Fourth

Amendment.

The second question requires an analysis of clearly established law.  For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."  Maxwell v. Cty. of San Diego, 708 F.3d 1075, 1082 (9th Cir. 2013).  Stated differently, "[a] clearly established right is one that is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  Mullenix v. Luna, 136 S. Ct. 305 (2015) (quoting Reichle v. Howards, 566 U.S. 658, 664 (2012)).  In determining whether a right is clearly established, the court must look to "cases relevant to the situation [the officers] confronted," Brosseau v. Haugen, 543 U.S. 194, 200 (2004) (quotation marks omitted) ("Brosseau"), keeping in mind that a case need not be "directly on point."  Gravelet-Blondin v. Shelton, 728 F.3d 1086, 1093 (9th Cir. 2013) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  Existing precedent, however, "must have placed the . . . constitutional question beyond debate."  al-Kidd, 563 U.S. at 740.  Ultimately, "[t]he dispositive question is 'whether the violative nature of particular conduct is clearly established.'"  Mullenix, 136 S. Ct. at 308 (quoting al-Kidd, 563 U.S. at 742).  "The plaintiff bears the burden of proof that the right allegedly violated was clearly established[.]"  Romero, 931 F.2d at 627.

Moreover, the analysis "is limited to 'the facts that were knowable to the defendant officers' at the time they engaged in the conduct in question."  Longoria v. Pinal Cty., --- F.3d ----, 2017 WL 4509042, at *7 (9th Cir. 2017) (quoting Hernandez v. Mesa, 137 S. Ct. 2003, 2008 (2017)).  But because this is a determination on summary judgment, any disputed facts must be construed in the light most favorable to Plaintiffs to the extent there is room for debate.  Id.

In a string of published and unpublished opinions responding to recent Supreme Court precedent, the Ninth Circuit has clarified the district court's duty when determining whether a purported violation involves a "clearly established right."[9]  To that end, the Ninth Circuit holds

---

[9] In addition to those cases cited or discussed above, the Ninth Circuit has recently discussed or decided qualified immunity with respect to the conduct of law enforcement in the following cases: Bartlett v. Nieves, --- Fed. App'x. ----, 2017 WL 4712440 (9th Cir. 2017); McGuigan v. Cty. of San Bernardino, --- Fed. App'x ----, 2017 WL 4570610 (9th Cir. 2017); Shafer v. Cty. of Santa

that before qualified immunity can be denied and liability imposed on an officer, the district court must identify precedent in existence on the date of the incident that put the officer "on clear notice that using deadly force in [the] particular circumstances would be excessive." S.B. v. Cty. of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017) ("S.B."). "General excessive force principles," such as those stated in Graham and Garner, are not "'inherently incapable of giving fair and clear warning to officers,' but they 'do not by themselves create clearly established law outside an obvious case.'" Id. (quoting White, 137 S.Ct. at 552). Thus, in most situations, the court must identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. Id. at 1015-16. But "[i]n the absence of 'a case directly on point,' [the court] compare[s] 'specific factors' relevant to the excessive force inquiry to determine whether a reasonable officer would have known that the conduct in question was unlawful." Isayeva v. Sacramento Sheriff's Dep't, 872 F.3d 938, 947 (9th Cir. 2017) (quoting Bryan v. MacPherson, 630 F.3d 805, 826 (9th Cir. 2010)).

Davis relies on a single Ninth Circuit decision to show that the law was "clearly established," Bryan v. MacPherson, 630 F.3d at 810 (quoting Cavanaugh v Woods Cross City, 625 F.3d 661 (10th Cir. 2010)). In Bryan, the plaintiff, wearing the t-shirt and boxer shorts in which he had slept, was driving on the highway with his brother when they were stopped by a California Highway Patrolman. The Patrolman issued the plaintiff a speeding citation, which upset him greatly. After resuming his drive, the plaintiff was stopped a second time at an intersection where the defendant police officer was stationed to enforce seatbelt regulations. The officer stepped in front of the car and signaled to the plaintiff that he was not to proceed. The plaintiff immediately realized that he had mistakenly failed to buckle his seatbelt after his earlier encounter. The officer approached the passenger window and asked the plaintiff whether he knew why he had been stopped. The plaintiff was upset and simply stared ahead. The officer asked him to turn down his

Barbara, 868 F.3d 1110 (9th Cir. 2017); Estate of Lopez v. Gelhaus, 871 F.3d 998 (9th Cir. 2017); Sharp v. Cty. of Orange, 871 F.3d 901 (9th Cir. 2017); Krueger v. City of Missoula, 685 Fed. App'x 631 (9th Cir. 2017), and Bui v. City & Cty. of San Francisco, --- Fed. App'x ----, 2017 WL 2814388 (9th Cir. 2017).

radio and pull over to the curb, which the plaintiff did. The plaintiff became increasingly angry at himself, hit his steering wheel and yelled expletives to himself. After pulling his car over and placing it in park, the plaintiff stepped out of the car. It was undisputed that the plaintiff was agitated, standing outside his car, yelling gibberish and hitting his thighs, clad only in his boxer shorts and tennis shoes. It was also undisputed that the plaintiff did not verbally threaten the officer, was standing twenty to twenty-five feet away and was not attempting to flee. The officer testified that he told the plaintiff to remain in his car, while the plaintiff testified that he did not hear the officer's instruction. There was one material dispute about whether the plaintiff took a step towards the officer. Thereafter, "[w]ithout giving any warning, [the officer] shot [the plaintiff] with his taser gun." Bryan, 630 F.3d at 822. The electrical current immobilized plaintiff and he fell face first to the ground, fracturing his teeth and sufficing facial contusions. Based on these facts, the Ninth Circuit held that the officer's actions violated the plaintiff's Fourth Amendment rights. Id. at 832.

In analyzing the applicability of qualified immunity, the Ninth Circuit turned to state law at the time of the incident and determined that caselaw placed the officer on fair notice that his intermediate level of force was unjustified. The Bryan court reasoned that the officer had stopped the plaintiff for the most minor of offenses; there was no reasonable basis to conclude that the plaintiff was armed; and the plaintiff was twenty feet away and did not physically confront the officer. Id. at 832-33. The Bryan court, however, noted that as of the time of the incident, there was no Supreme Court decision addressing whether the use of a taser in dart mode constituted an intermediate level of force. Id. at 833. The Bryan court also noted that two other Ninth Circuit panels concluded that the law regarding tasers was not sufficiently clearly established to warrant denying officers qualified immunity. Id. (citing Mattos v. Agarano, 590 F.3d 1082, 1089-90 (9th Cir. 2010) and Brooks v. City of Seattle, 599 F.3d 1018, 1031, n. 18 (9th Cir. 2010)). The Bryan court ultimately concluded qualified immunity applied because a reasonable officer "could have made a reasonable mistake of law regarding the constitutionality of the taser use in the circumstances [the officer defendant had] confronted." Id.

1    Although the Bryan decision provides guidance regarding the use of taser, the decision

2    does not place the constitutional question in this case "beyond debate." Al-Kidd, 563 U.S. at 740.

3    The Bryan court cited the following "specific factors" relevant to the excessive force inquiry to

4    determine whether a reasonable officer would have known that the conduct in question was

5    unlawful:  the suspect was stopped for the most minor of traffic offenses; there was no reasonable

6    basis to conclude that the suspect was armed; the suspect is twenty feet away; and the suspect did

7    not physically confront the officer.  These "specific factors" are not present here.  In this case,

8    Officer Phan was confronted with a highly intoxicated individual.  Despite having been tasered,

9    Davis continued to resist Officer Phan.  Davis pulled out one of the prongs and was kicking and

10   cavorting.  Further, there was a crowd gathering around chanting anti-police expletives and

11   Officer Phan was alone.  Two additional officers arrived, but Davis continued to resist arrest.

12   Under these circumstances, Officer Phan could have made a reasonable mistake of law regarding

13   the constitutionality of his taser use against Davis' resistance.  Officer Phan's actions were neither

14   "plainly incompetent" nor demonstrated a knowing violation of clearly established law, and

15   accordingly he is entitled to qualified immunity for his actions during the October incident.  See

16   Hunter v. Bryant, 502 U.S. at 229.

17       **C.    State Law Claims for False Arrest/Imprisonment and Violation(s) of Civil Code
18              §52.1- October Incident**

19       To the extent Davis' false imprisonment claim is based upon the October incident, the

20   claim is also Heck-barred for the reasons discussed previously.  See, e.g., Cabrera v. City of

21   Huntington Park, 159 F.3d 374, 380 (9th Cir. 1998) (recognizing that to prevail on a false

22   imprisonment claim, a plaintiff must show a lack of probable cause and, a false imprisonment

23   claim cannot accrue under Heck until any conviction based on that arrest has been invalidated).[10]

24       Davis asserts an additional state claim for violation of Civil Code section 52.1, which

25   prohibits an individual from interfering with another's enjoyment of federal constitutional rights

26

27   _____
     [10] The claim is also barred by California Penal Code section 836.5.

28   Case No.: 5:15-cv-05603-EJD
     ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

by "threats, intimidation, or coercion." Inasmuch as Davis acknowledges his section 52.1 claim is based upon the same allegations of excessive force underlying his Section 1983 claim[11], the claim is barred by qualified immunity. <u>Briley v. City of Hermosa Beach</u>, No. 05-8127 AG, 2008 WL 4443894, at *6 (C.D. Cal. Sept. 29, 2008); <u>see also</u> <u>M.L. ex rel. Autry v. City and County of San Francisco</u>, No. 04-1782 PJH, 2006 WL 335386, at *7 (N.D. Cal. Feb. 13, 2006). In the absence of a constitutional violation based on the October incident, Davis' section 52.1 claim fails as a matter of law. <u>See</u> <u>Bulfer v. Dobbins</u>, No. 09-1250 JLS, 2011 WL 530039, at *14 (S.D. Cal. Feb. 7, 2011). Furthermore, aside from the use of force (which does not amount to a constitutional violation for reasons set forth above), Davis has not offered evidence of any threats, intimidation or coercion by the Defendants. Accordingly, the section 52.1 claim also fails for lack of proof.

Defendants are granted summary judgment on Davis' state law claims arising out of the October incident.

### D. Section 1983 Claim Arising out of November Incident

Citing <u>Minnesota et al. v. U.S. Jaycees</u>, 468 U.S. 609, 622 (1984), Davis contends that his constitutional right to free association under the First Amendment was violated when he was ejected from the Stadium in November. Davis' reliance on <u>Minnesota et al. v. U.S. Jaycees</u> is misplaced; the Supreme Court's decision cannot be reasonably interpreted as establishing a constitutional right to attend professional football games at a stadium.

Davis also contends that his ejection from the Stadium amounted to an unlawful arrest without probable cause. A person is seized for purposes of the Fourth Amendment only if, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." <u>United States v. Mendenhall</u>, 446 U.S. 544, 554 (1980). Here, the conversation between Davis and Officer Phan was not an unlawful seizure. <u>See</u> <u>Mendenhall</u>, 446 U.S. at 554 ("[c]haracterizing every street encounter between a citizen and the police as a 'seizure' . . . would impose wholly unrealistic restrictions upon a wide variety of

---

[11] <u>See</u> Davis' Opposition, p.9.

legitimate law enforcement practices").  Further, Officer Phan did not "seize" Davis when he informed him that he needed to leave the Stadium.  <u>Osborne v. City of Burns</u>, No. 11-80 SU, 2012 WL 930815, at *8 (D. Or. February 27, 2012).  Davis was free to leave; he was just not permitted to remain at the Stadium.

Even if the brief interaction between Officer Phan and Davis amounted to a seizure (which it did not), Officer Phan is entitled to qualified immunity.  Officer Phan believed that Davis was not allowed to return to the stadium until he had successfully completed an anger management class.  Phan Decl., ¶2.  Officer Phan also believed that he was authorized by Stadium policy and the Santa Clara City Code to eject Davis because Davis used profanities, which is a violation of Santa Clara City Code section 9.05.160(g), and because of Davis' prior arrest.  Davis fails to cite to any legal authority that would have placed Officer Phan on notice that his conduct during the November incident violated clearly established statutory or constitutional rights of which a reasonable official would have known.

### E.    State Law Claims Arising out of November Incident

For the reasons discussed above, Davis has failed to establish a constitutional violation arising out of the November Incident.  Accordingly, Defendants are entitled to summary judgment on Davis' state law claims arising out of the November incident.

### F.    Monell Liability

Finally, Davis contends that the City of Santa Clara ("City') is liable for civil rights violations under <u>Monell v. Dep't of Soc. Servs.</u>, 436 U.S. 685 (1978) because the City failed to train Officer Phan adequately regarding the use of a taser, or alternatively acted with deliberate indifference.  Under <u>Monell</u>, a plaintiff must show:  (1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to "deliberate indifference" to the plaintiff's constitutional right; and (4) that the policy was the "moving force behind the constitutional violation."  <u>Holguin v. City of San Diego</u>, 135 F.Supp.3d 1151 (S.D. Cal. 2015).

Having already determined that Davis' constitutional rights were not violated, Davis

cannot prevail on his <u>Monell</u> claim.  Moreover, Davis fails to cite to any evidence whatsoever regarding the City's training program, much less explain how the City's training was inadequate. Instead, Davis' expert, Clark, opines that police departments across the country have recognized and trained their officers in safe and accepted methods to encounter, contain and arrest subjects in order to avoid the use of excessive force, and that Officer Phan did not use any of those methods. Clark Decl., ¶24(a). Conspicuously absent from Clark's declaration is any specific information about the City's allegedly inadequate training.

Davis also fails to cite to evidence of indifference that led to the deprivation of Davis' rights.  Instead, Davis relies on Clark once again, who opines that the City's Police Department "appears to have endorsed" Officer Phan's conduct because the Police Department has not disciplined or retrained him. The City's response to Officer Phan after the incident is not probative of any City policy or deliberate indifference at the time of the incidents at issue.

V.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment is GRANTED.

**IT IS SO ORDERED.**

Dated:  March 28, 2018

_____
EDWARD J. DAVILA
United States District Judge